(February 27, 2007)

■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v YURY PADILLA, Respondent. [830 NYS2d 541]—

Order, Supreme Court, Bronx County (Richard Lee Price, J.), entered October 28, 2005, which granted defendant's motion to suppress marijuana discovered in an apartment, keys to the apartment, and statements made by defendant, unanimously reversed, on the law and on the facts, the suppression motion denied, the indictment reinstated and the matter remitted to the Supreme Court for further proceedings.

Lieutenant Edwin Maldonado and Police Officer Frank Burns were the sole witnesses at defendant's combined *Mapp/*

*Dunaway/Huntley* hearing. Both told the court that on October 28, 2004, around 6:00 P.M., they were with two other officers, on anticrime patrol. The team was in plainclothes, in an unmarked car, in the area of 166th Street and College Avenue in the Bronx. Maldonado stated that about a week earlier he had attended a community meeting, where an elderly woman approached him to discuss suspicious activity she had observed involving a Hispanic man with a blue BMW in the area of 166th Street and College Avenue. Maldonado testified that the woman had told him that the man with the BMW was seen coming and going from one of the buildings in that area, accompanied by many different people.

Maldonado related that during the October 28 patrol, his team was on 166th Street when he saw defendant traveling westbound in a blue BMW. Both Burns and Maldonado testified that they saw defendant park the BMW outside 305 East 166th Street, and that they parked their car down the block to observe him. Burns testified that 305 East 166th Street is a "Safe Halls Building" (the management of Safe Halls Buildings have given signed affidavits to the police authorizing them to arrest anyone who enters such a building without a legitimate reason). |

Burns told the court that the officers saw defendant enter 305 East 166th Street, that they waited 7 to 10 minutes, and then saw him leave the building. Believing that defendant was the man described to Maldonado at the community meeting, the officers approached him on foot. Burns testified that the officers sought to inquire whether defendant had a lawful basis to be in the Safe Halls Building. He related to the suppression court that he was the first of the group to reach the defendant, and that he asked him "where he was coming from." Burns testified that defendant stated that he was coming from up the block, which Burns knew was a lie. The officer also testified that as he and defendant were talking, he noticed defendant extend his right hand and nonchalantly drop a key chain. Burns saw the keys fall between the curb and the front wheel of the car, and he picked them up. The officer related that he again asked defendant, "[A]re you sure you were not coming from this building?" The defendant changed his answer, now stating that he had been visiting a family in apartment 3B.

Both Maldonado and Burns told the court that to verify defendant's account, they took the defendant back into the building, to apartment 3B. Burns related that he stayed with defendant on the landing between the second and third floors of the building while Lieutenant Maldonado went to apartment 3B. Maldonado recounted that no one in 3B knew defendant.

Both officers testified that there was an overpowering odor of marijuana coming from the fourth floor of the building and that they heard the sound of a generator coming from apartment 4E. Officer Burns asked the defendant if he lived in 4E. He related that defendant said he did not live there. Burns told the court that he asked defendant if he minded if the officers went into 4E, and the defendant said: "[Y]ou are the police you can go in. I didn't do anything wrong. You can go in. Go ahead." Burns testified that at some point, defendant added, "I'm the porter. I have keys for lots of things here."

Lieutenant Maldonado testified that there was a star-shaped key on the defendant's key chain which matched a similarly shaped lock on the apartment door. He stated that the officers entered the apartment which he described as follows: "at some point it was a one-bedroom apartment that had been converted into a marijuana growth factory. When I say it was converted, it had been rigged with an in-ground irrigation system, strong high powered lighting to make these marijuana plants g[r]ow [sic], and a whole room full of marijuana plants, as well as a drying room and a packaging room." Defendant was arrested. Maldonado testified that he later learned that defendant had asked the building owner if he could lease the apartment under a fictitious name, and that the building owner agreed to let him do so. Maldonado also testified that the building owner knew defendant's intended use of the apartment.

Defendant presented no evidence. However, his counsel argued that the encounter on the street was an unlawful stop, because defendant was not observed doing anything indicative of criminality. He claimed that the building's status as a Safe Halls Building was a mere pretext for the stop, which was illegally based upon a "hunch." Counsel also argued that defendant was not free to leave when the police took his keys, and that their testimony that defendant dropped them was incredible. Finally, counsel asserted that the People had not proved that defendant consented to the search of the apartment. The defendant requested that the drugs, the keys, and the statements he made be suppressed.

The People countered that the questioning of defendant outside the building was not a custodial interrogation. They also argued that the ensuing investigation was an appropriate response to defendant's lies, and that it was appropriately circumscribed based on the incriminating information as it unfolded before them. The People asserted that defendant did not have standing to challenge the entry into the apartment, given his position that he did not live there. However, they

argued that because defendant claimed to be a porter in the building, he had apparent authority to give consent to use his keys to open the apartment door. The motion court granted suppression. On appeal, both the People and defendant essentially reiterate the same arguments made before the suppression court. We reverse.

The first issue for review is whether the officers' conduct was lawful at its inception (*People v De Bour*, 40 NY2d 210, 222 [1976]). We find that it was. A lieutenant on the team had received information about a man involved in suspicious activity in this specific area. When he saw defendant driving the car described by the informant in that area, he properly investigated. The officers observed defendant entering, and a few minutes later, leaving 305 East 166th Street, a Safe Halls Building. Collectively, these facts were sufficient to provide the team with a level one, "objective and credible reason" to ask the defendant general questions about where he had come from (*see People v Hollman*, 79 NY2d 181, 184 [1992] [request for information allows limited intrusion to ask general questions, not necessarily indicative of criminality]; *and see People v Valderas*, 7 AD3d 265 [2004], *lv denied* 3 NY3d 649 [2004] [officer's question about the source of blood on defendant's clothes was for clarification, it did not constitute interrogation]). Further, the fact that more than one officer approached the defendant on the street did not render Officer Burns's general questioning unlawful (*see People v Montague*, 175 AD2d 54 [1991] [four officers conducted general request for information]).

The encounter then appropriately progressed from a "request for information" to a temporary detention. This was based on defendant's behavior, which included: lying about coming from down the block and not from the Safe Halls Building; stating that he was visiting a family in apartment 3B of the building; and surreptitiously dropping a set of keys to the ground. At this point, the officers acted reasonably in detaining defendant and bringing him to apartment 3B to verify his explanation for being in the restricted building (*People v Crawford*, 262 AD2d 330, 331 [1999] [brief detention warranted to allow police to verify truth of defendant's inconsistent explanation regarding possession of a cell phone]).

When the occupants of 3B denied knowing defendant, the police arguably had probable cause to arrest him for trespass, and certainly had authority to continue to detain him to determine if he had a legitimate reason for being in the Safe Halls Building (*People v Williams*, 16 AD3d 151 [2005], *lv denied* 5 NY3d 771 [2005] [police had probable cause to arrest defendant for

trespass after he gave three conflicting false accounts of why he was inside the lobby of an apartment building]; *People v Crawford*, 279 AD2d 267 [2001], *lv denied* 96 NY2d 799 [2001] [same]).

In addition, while standing on the third floor of the building, the group was confronted with an overwhelming smell of marijuana, which the police identified as coming from upstairs, specifically apartment 4E. One of the officers observed that a key to that apartment was on the key ring defendant dropped. Defendant told the officers that he did not live in that apartment (*see People v Osborne*, 194 AD2d 427 [1993], *lv denied* 82 NY2d 724 [1993]), and he consented to the officer's request to use the key to enter (*see People v Alvaranga*, 198 AD2d 286 [1993], *affd* 84 NY2d 985 [1994]). Moreover, the keys, now in the officer's possession, had been abandoned by defendant when he dropped them on the street (*People v Ramirez-Portoreal*, 88 NY2d 99, 110 [1996]; *People v Flynn*, 15 AD3d 177 [2005], *lv denied* 4 NY3d 853 [2005]).

Defendant's acts were not, as he contends, a spontaneous reaction to an illegal seizure. Rather, they were a calculated effort to disassociate himself from the restricted access building (*see Flynn*, 15 AD3d at 178-179, *supra*). Thus, he was validly arrested upon the discovery of the sophisticated marijuana factory which had been set up there.

Defendant's statements that he was a porter in the building, that he had keys to lots of places, and that he did not live in the apartment were not the product of coercion or illegality, but instead spontaneously made, in an effort to extricate himself from the illegal marijuana factory and "maintain his facade of innocence" (*see People v Li*, 235 AD2d 211, 212 [1997], *lv denied* 89 NY2d 1037 [1997], quoting *People v Yukl*, 25 NY2d 585, 591-592 [1969], *cert denied* 400 US 851 [1970]). Concur—Mazzarelli, J.P., Andrias, Sullivan, Nardelli and McGuire, JJ.